# Case No. 16,675.

## UNITED STATES v. WHITE.

[5 Cranch, C. C. 38.] [1]

Circuit Court, District of Columbia. Nov. Term, 1836.

QUASHING INDICTMENT—LIMITATION OF TIME—SEPARATION OF WITNESSES—COMPETENCY—RELIGIOUS BELIEF—IMPEACHMENT—EVIDENCE OF ACCOMPLICES—DECLARATIONS.

1. The court will not quash an indictment because it appears upon the record that the indictment was not found within two years after the offence committed, for that would deprive the United States of the right to reply that the defendant was a person fleeing from justice; or to show it in evidence on the trial. The defendant may avail himself of the limitation either by special plea or by evidence upon the general issue.

[Cited in U. S. v. Cook, 17 Wall. (84 U. S.) 180.]

2. The court, at the suggestion of either party, will order some of the witnesses to be taken out of court, and kept by the marshal, while other witnesses are under examination; but will not order them to be kept apart from each other.

3. When a witness is objected to on the ground of his disbelief of a God, and of a future state of rewards and punishments, he is not to be examined on oath respecting his religious sentiments, but will be permitted to explain them; and if he then declares that he believes in a future state of existence, and of a Supreme Being who will punish him, either in this world or the next, for his evil deeds, and if it appears in evidence that he has so declared, before the trial, and that he sent his children to the Sunday-school, and his wife and children regularly to church, the court will permit him to be examined as a witness, leaving his credibility to the jury.

4. The court will not permit the declarations of another defendant, charged with the same offence in a separate indictment, to be given in evidence against this defendant, such declarations having been made after the supposed accomplishment of the common purpose.

[Cited in U. S. v. Gardiner, Case No. 15,-186a.]

5. If a witness be cross-examined upon a collateral matter, evidence will not be admitted to disprove that matter, in order to discredit the witness.

6. The only question as to the character of a witness, proper to be asked, is, "Are you acquainted with the general reputation of the witness as to veracity? And from your knowledge of that general reputation, would you believe him upon his oath?"

[Cited in Fletcher v. State, 49 Ind. 133.]

7. Evidence of the general bad character of the witness will not be permitted to be given to impeach his credibility.

8. A person may flee from justice although no process was issued against him.

9. The statute of limitations runs in favor of the offender, although it was not known to the United States or any of its officers of justice,

[1] [Reported by Hon. William Cranch, Chief Judge.]

that he was the person who committed the offence.

10. The departure of the offender from the vicinity of the place wherein the offence was committed, to his usual residence in another part of the United States. for the purpose of avoiding punishment for that, or any other offence, is a fleeing from justice, and the statute of limitations is no bar to the prosecution, unless, within two years, he returned to the place wherein the offence was committed, and his return was so open and public, and under such circumstances, that opportunity was afforded, by the use of ordinary diligence and due means, to have arrested him, and that two years and more have elapsed since that period to the time of finding the indictment. Quære?

11. According to the practice of this court, when a new trial is granted, the cause is not to be tried again at the same term, unless by consent of parties and leave of the court; but this rule does not apply to cases where the jury has been discharged because they could not agree upon a verdict.

12. If the defendant was not present, nor aiding or abetting the act, although he was concerned in the design to commit the offence, he is only liable as accessory before the fact.

13. A verdict finding the defendant "not guilty, upon the plea of limitations, more than two years having elapsed from the committing of the offence to the finding of the indictment," is argumentative, and therefore bad.

This was an indictment against Richard H. White for burning the treasury buildings of the United States.

The indictment contained three counts. The first charged that the defendant, at, etc., on the 30th of March, 1833, with force and arms, "a certain public building, called the treasury office of the United States, situate in the city of Washington, in the county and district aforesaid, one of the cities of the District of Columbia, being one of the public buildings in the said city of said District, belonging to the United States, did maliciously and wilfully burn; against the form of the statute," etc. The second count charged, that the defendant, on the day and year aforesaid, at, &c., with force and arms, "on the night of the said day, a certain house called the treasury office of the United States, in which certain persons, the clerks and watchmen in the employment of the United States, did reside and lodge, belonging to the United States, situate in the said county and district, feloniously, wilfully, and maliciously, did set fire to, and burn and consume, against the peace and government of the United States." The third count charged, that the defendant, on the day and year aforesaid, at, &c., with force and arms, "on the site of a certain needful building belonging to the United States, being the treasury office of the United States, the site whereof was ceded to the United States, and under their jurisdiction, being in the county and district aforesaid, a certain dwelling-house, wilfully and maliciously did burn, against the form of the statute," etc. The indictment was not found until the 30th of March, 1836. The first count was upon the act of congress of the 2d of March, 1831 (4 Stat. 448), "for the punishment of crimes

in the District of Columbia," the first section of which enacts that every person who shall be convicted, in any court in the District of Columbia, of any of the offences therein named, one of which is "arson," shall be sentenced to suffer imprisonment and labor, for the time and times thereinafter prescribed in the penitentiary of the District of Columbia. And by the third section it is enacted, that every person duly convicted of the crime "of maliciously, wilfully, or fraudulently burning any dwelling-house," "or of maliciously and wilfully burning any of the public buildings in the cities, towns, or counties of the District of Columbia, belonging to the United States," "shall be sentenced to suffer imprisonment and labor, for a period of not less than one nor more than ten years, for the first offence." The second count was at common law. The third count was upon the first section of the act of congress of March 3, 1825, c. 67 (4 Stat. 115).

W. L. Brent, for defendant, moved the court to quash the indictment, because it appeared upon the record that more than two years had elapsed between the committing of the offence and the finding of the indictment. And by the act of congress of the 30th of April, 1790 (1 Stat. 112), "for the punishment of certain crimes against the United States," it is enacted "that no person or persons shall be prosecuted, tried, or punished, for treason, or other capital offence aforesaid, wilful murder or forgery excepted, unless the indictment for the same shall be found by a grand jury within three years next after the treason, or capital offence aforesaid, shall be done or committed; nor shall any person be prosecuted, tried, or punished, for any offence not capital, nor for any fine or forfeiture under any penal statute, unless the indictment or information for the same shall be found or instituted within two years from the time of committing the offence, or incurring the fine or forfeiture aforesaid: Provided, that nothing herein contained shall extend to any person or persons fleeing from justice."

THE COURT (nem. con.) refused to quash the indictment; because, until the facts shall appear upon the trial, it cannot appear that the defendant was not a person fleeing from justice, and therefore not entitled to the benefit of the limitation of time; and if he is entitled to its benefit he may have it upon plea, or upon evidence under the general issue.

Mr. Brent then moved that sundry witnesses on the part of the United States should be taken out of court, and kept separate from each other during the examination of the others.

THE COURT (nem. con.) ordered the marshal to keep them out of court, but refused to order them to be kept separate from each other.

Mr. Brent then objected to one William Hicks, as a witness, upon the ground that he does not believe in the existence of a God, and a future state of rewards and punishments, and cited Rosc. Ev. (Am. Ed.) 96, 97, to show that the witness cannot himself be examined as to his belief.

Mr. Key, U. S. Atty., cited Starkie, Ev. pt. 2, p. 123, and Rosc. Ev. 97, 98.

Mrs. Harker was then called by the defendant's counsel, and testified that some years ago she had several conversations with Hicks, at her boarding-house in New York, in which he said he did not believe in the existence of a God, nor of a future state of punishment.

THE COURT (nem. con.) permitted Hicks to state what his opinions were. He then stated that he always had believed in the existence of a Supreme Being, and that he will punish him, in this world or the next, for his evil deeds; that he does now believe in a future state of existence; that he sends his children regularly to the Sunday-school, and his wife and children to church. Upon being asked whether he had disclosed these sentiments to any of the witnesses, he said that he did not know that he had.

Mr. Merritt, a police officer of New York, testified, that having heard that Hicks' testimony would be objected to on account of his religious opinions, without disclosing his object to Hicks, he asked him his opinion, when Hicks stated that he believed in the existence of a God, and a future state of punishment.

THE COURT permitted him to be sworn.

J. R. Key, for the United States, offered in evidence against the defendant Richard H. White, the admissions of Henry H. White, who stands charged with the same offence, in a separate indictment, evidence having been offered tending to prove that both were in the city of Washington the day preceding the burning of the treasury building, that both went away together in the evening, and that the defendant had told Henry to say nothing of burning the treasury.

Mr. Key cited Starkie, Ev. pt. 4, p. 1302.

Mr. Brent, for the defendant, denied that the doctrine of Starkie applied to declarations made after the thing was done, but only to declarations made in prosecution of the common purpose, in fieri, as part of the res gestæ. Rosc. Ev. 306; Starkie, Ev. pt. 2, p. 46–48.

THE COURT (THRUSTON, Circuit Judge, contra) refused to permit the declarations of Henry H. White, made after the supposed accomplishment of the common purpose, to be given in evidence against Richard (the defendant,) in this trial, they having been indicted separately, and not charged with a conspiracy.

The witness, Fisk, having, upon cross-examination by Mr. Brent, denied that upon the trial of one Drew in Pennsylvania, he had sworn that he did not know Finch, Mr. Brent now called a witness (Mr. Blaney) to prove that Fisk did so testify on that trial, in order to discredit him by this contradiction or falsehood.

J. R. Key, for the United States, objected that the cross-examination was upon a col-

lateral matter, and that it is not competent for the party thus cross-examining a witness, to bring other witnesses to contradict him on such collateral matter. Starkie, Ev. pt. 2, pp. 134, 138, 140, 141, 144, 145; 1 Chit. Cr. Law, 622; Harris v. Tippett, 2 Camp. 637.

Mr. Brent, contra, cited Starkie, Ev. pt. 2, p. 145.

THE COURT (THRUSTON, Circuit Judge, absent) refused to permit the defendant's counsel to bring evidence to prove that Fisk perjured himself on the trial of Drew by swearing that he did not know Finch; and to contradict his assertion, upon cross-examination in this cause, that he did not at that time know him; it being a collateral matter brought out by the cross-examination.

THE COURT also said that the only question as to the character of the witness, proper to be asked, is, "Are you acquainted with the general reputation of the witness as to veracity; and from your knowledge of that general reputation would you believe him upon his oath?"

THE COURT refused to permit evidence to be given of the general bad character of the witness.

R. J. Brent, for the defendant, prayed the court to instruct the jury "that there is no evidence before the jury that the defendant fled from justice; or that if the court should be of opinion that there is some evidence of that fact, then to charge the jury that if they should be of opinion from the evidence that the defendant did not flee from the United States, or conceal himself to avoid process, he is entitled to the benefit of the limitation of the statute." The defendant's counsel contended that "fleeing from justice" meant fleeing from process. That no person can be said to flee from justice until process has been issued against him; and that such is the meaning of the constitution of the United States (article 4, § 2), and of the act of congress of the 12th of February, 1793 (1 Stat. 302), and of the act of March 3, 1801, § 6 (2 Stat. 115). He might have been arrested as well in one district of the United States as another; so that mere removal from one district to another cannot be called fleeing from justice, unless it be done with intent to evade process. Act Cong. Sept. 24, 1789, § 33 (1 Stat. 91). Besides, he appeared openly and publicly in this city in March, 1834. Fowler v. Hunt, 10 Johns. 464. It is not necessary that the United States should have known that the defendant committed the offence, to entitle him to the benefit of the limitation.

Mr. Key, contra, contended that the defendant could not avail himself of the limitation unless the United States knew that he had committed the offence, or had the means of knowing it, as in Watkins' Case [Case No. 16,649], where the means of knowing the fraud were in the treasury department. If the defendant once fled from justice he is forever barred of the benefit of the statute. Hysinger v. Baltzell, 3 Gill & J. 158.

Mr. Brent, in reply, contended, that although he might have fled at first, if he afterwards returned and appeared so publicly in Washington that he might have been arrested, the statute began to run in his favor from the time of such return. Faw v. Roberdeau, 3 Cranch [7 U. S.] 176.

THE COURT refused to give the instruction as prayed, but instructed them that if they "believe from the evidence that the departure, from this district, by the traverser, on the evening of the 30th of March, 1833, or at any time afterwards within two years thereafter, was for the purpose or with the view to avoid punishment for the offence of burning the treasury building, or for any other offence, this was fleeing from justice, and the statute of limitations is no bar; unless the jury should also believe the said prisoner afterwards returned to the county of Washington, and that his return was so open and public, and under such circumstances, that opportunity was afforded by the use of ordinary diligence and due means, to have arrested him; and that two years and more have elapsed from that period to the time of finding of the indictment in this case."

THRUSTON, Circuit Judge, dissented; and his reasons were understood to be, that if the defendant once fled from justice, no subsequent return would enable him to avail himself of the limitation; and that he could in no event avail himself of the limitation unless the United States knew that he had committed the offence. He was also understood to be of opinion, that there was not sufficient evidence of the defendant's return, &c., to justify an instruction upon that point.

CRANCH, Chief Judge, said that if the defendant (as his counsel had intimated) was willing to agree to the instruction, he should not object to it; but he was not entirely satisfied with it. He said there were two modes of fleeing from justice, namely, departing from the jurisdiction of the offended government, and concealing himself within it. The removing from one place to another in the same jurisdiction, unless clandestinely, or with intent to escape from justice, would not be a fleeing from justice; nor would his return to Washington be necessary to enable him to avail himself of the limitation, if he had not concealed himself, but appeared openly in New York, his usual place of residence. The offence was against the government of the United States, and the offender was as liable for arrest in New York as in Washington. However, as the defendant's counsel had agreed to the instruction as it was drawn up, he should not object to it. He observed also, that he did not think it necessary that the United States should have known that the defend-

ant had committed the offence; in order to his availing himself of the bar, by limitation of time.

Mr. Brent, for the defendant, then prayed the court to instruct the jury, "that if they believe, from the evidence, that the traverser was not personally present at the time of applying the fire to the treasury building, or not sufficiently near, at the time, to be aiding and abetting in the applying of the fire, although the jury should believe that he was concerned in the design of burning said building, then the traverser is but an accessory before the fact, and is entitled to be acquitted under the present indictment."

This instruction did not seem to be opposed by the attorney for the United States, who said that he should contend that if the defendant was near enough to aid the person who applied the fire, by keeping others off, or by facilitating his escape, etc., he would be considered as a principal. To this suggestion the counsel for the defendant assented, and the court gave the instruction as prayed.

THRUSTON, Circuit Judge, dissented, and his reason was understood to be, that there was no evidence that the defendant was not present at the burning.

The jury retired on Saturday, December 24th, at 3 o'clock, p. m., and were kept in their room until Tuesday, the 27th, at 2 o'clock, p. m., when they were discharged by consent of the parties, as they could not agree.

On the 6th of January, Mr. Brent, for the defendant, moved the court to continue the cause to the next term, upon the defendant's affidavit that Willard Carpenter, of Troy, would testify that the general character of Mrs. Baldwin, and of William Hicks, is such that they cannot be believed on oath, and that he has used due diligence, &c.

Mr. Key, for the United States, admitted that Mr. Carpenter would testify as stated in the affidavit.

As this cause stood upon the docket before that of Henry H. White, the court ordered it to be first tried, although Henry requested to be tried first, and offered himself ready, but refused to be tried with Richard.

Mr. Brent, for the defendant, Henry H. White, contended that according to the practice of this court, a cause, once tried, cannot be tried again at the same term, unless by consent; and must be put at the end of the docket.

CRANCH, Chief Judge, said that that rule was applicable only to causes which had been tried, and a verdict found, and a new trial granted. This cause cannot be said to have been tried until a verdict shall have been found. The jury was discharged by consent because they could not agree; so that no verdict has yet been found in this cause.

The cause came on again for trial on the 6th of January, 1837.

The objection was again taken to the admission of William Hicks as a witness; but as THRUSTON, Circuit Judge, was absent, and CRANCH, Chief Judge, was in favor of admitting the witness, it did not prevail, and the witness (Hicks) was sworn and examined.

Mr. Key, for the United States, offered to read Hicks' affidavit, made as a foundation for the arrest of the defendant, in corroboration of Hicks' testimony, which had been impeached by showing that he had made contradictory statements; and to show that there was no combination with Mrs. Baldwin, one of the witnesses for the United States.

Mr. Brent, contrà, cited 1 Starkie, 148, and 3 Starkie, pt. 4, p. 1758.

THE COURT (THRUSTON, Circuit Judge, contrà, or doubting) rejected the affidavit.

THE COURT (THRUSTON, Circuit Judge, contrà) again gave the instruction respecting the defendant's being an accessory only, unless present, aiding, and abetting, &c.

THE COURT also gave the same instruction to the jury which they had before given respecting the limitation of time, and the fleeing from justice.

THRUSTON, Circuit Judge, contrà, delivered the following opinion:

The question presented for the consideration of the court is on the following prayer (omitted). My opinion, at the former trial of the traverser, was different from that of a majority of the court; having assented only to the first branch of the instruction prayed, and dissented most explicitly from the last; that is to say, I was of opinion that if the jury should believe, from the evidence, that the traverser was guilty of having burnt the treasury building and fled from justice, that his return within this district afterwards (in the manner, and under the circumstances proved by the witnesses), conferred no right on him to claim the benefit of the limitation provided in the latter part of the thirty-first section of the act of congress, entitled "An act for the punishment of certain crimes against the United States." I was of opinion, and still am, that this benign indulgence in favor of the accused, of exemption from prosecution after a lapse of two years from the commission of the offence to the time of finding a presentment or indictment against him, admitted of no latitude or extension of construction in favor of the accused, from any supposed analogy between criminal and civil prosecutions. That if, in civil cases a return into the state, or jurisdiction of the court, or into the place where the cause of action accrued, of the debtor or party liable to the action, after having absented himself therefrom, rendered it incumbent on the party having the cause of action against

him, to bring his suit within the period provided by law after such return, or be liable to be barred by the act of limitation; that this was so ordained by positive enactment of law, namely, Laws Md. 1765, c. 12, § 8, or even without any positive statutory enactment, the court should have given this free construction to the law of limitation in civil cases, yet that it could not warrant any such construction of the clause of limitation in the aforesaid act of congress. In civil cases a cause of action cannot exist or at least it is difficult to conceive a case where the person liable to the action is unknown to the plaintiff. If it be a matter of contract, he must be known to the plaintiff; if of tort, he must be almost equally so. In all cases, however, I hold it clear that the return must be such as to afford the plaintiff or creditor reasonable means of arresting the defendant, otherwise laches may be imputed, and he shall not be excused if he do not avail himself of such occasion to pursue the party liable to him. I should hold, even in a civil case, that a bare passage through the country, or county, or place where he ought to be arrested, unless such transit be known to the creditor, or party having cause of action against him, and the means of arresting him be given, would afford no just grounds to limit the right of action. And the words of the Maryland statute clearly bear me out, I think, in this position. See Act 1716, c. 23, § 4, which provides, "that no person absenting himself out of this province, or that shall remove from county to county, after any debt contracted, whereby the creditor may be of uncertainty of finding out such person, shall have any benefit by this limitation in this act specified." Now is it not clear that the reason such wandering debtor shall have no benefit of the limitation is, that the creditor is uncertain where to find him: how uncertain? Because he may not actually know where he is—where to find him. If, then, the debtor returns into the country or place where his creditor should arrest him, and such return be unknown to the creditor, or if the return be not so public, and the stay of the debtor in the place not so long as that the creditor by ordinary diligence might have arrested him, there is the same uncertainty, and in such case the statute of limitation shall not bar him. It is true Act 1765, c. 12, § 3, says that the party having cause of action shall commence the same "after the presence, in this province," of the person liable thereto, within the time limited by the act aforesaid, of 1715; but surely such presence must be known to the party having cause of action, or should be so public, and of such duration as that by reasonable diligence the party having cause of action might know of such presence, or the uncertainty on his part is just as great as if the party liable were absent from the state, or jurisdiction of the court. If these views be correct, let us examine then what this uncertainty in civil cases is on the part of the creditor, which the statute speaks of, which protects him against the plea of limitation. It can be only, as in the words of the statute, the uncertainty where to find his debtor. Whenever this uncertainty exists, no matter whether the debtor returns into the place where the creditor may arrest him, or keeps away, as it is the same thing, unless he be there long enough and openly enough, that the creditor, by reasonable vigilance, might arrest him; in such case the uncertainty no longer exists. The words of the act are, "whereby the creditor may be at uncertainty where to find the debtor;" the only uncertainty that can well exist between debtor and creditor. Whenever this uncertainty exists, the creditor shall be excused if he does not arrest the debtor. Now, for argument's sake, let us admit, that although the clause of limitation in the act of congress aforesaid has no such provision as to the return of the offender within the state or territory where the offence was committed; yet that by equitable construction it should be considered as if it had such provision. Then, how should it be interpreted? Say to the same extent as the Maryland statutes have been interpreted in civil cases. Then should not the return be such that the government may be at no uncertainty where to find the offender? If it be so, should not the traverser, in order to avail himself of the clause of limitation, make it appear that no uncertainty where to find him, did exist? But this uncertainty can be disproved or removed by only two facts; first, actual knowledge on the part of the government that he was within this district, or a presumed knowledge from the duration or publicity of his stay, that he was here; and secondly, that he was known to the government to have been the offender. For, admitting that he was known to have been here, it is the same thing as if he had not been here, if it was not known to the government that he was the offender, or at least, that they had no just grounds of suspicion that he was the offender. If, then, I had been of opinion that the limitation proviso in the act of congress admitted of the latitude of construction that the return of the traverser to this district relieved him from the penalty of having fled (which, however, I cannot agree to), surely such return ought to have been under circumstances which removed from the government all uncertainty as to where he was to be found, and uncertainty as to his identity; for, let it be remarked, that of all uncertainties, those of knowing the perpetrator of a heinous crime, is perhaps the greatest; the very purpose of the criminal is to create this uncertainty; secrecy is his shield; now this cannot be between creditor and debtor; and the only uncertainty in such case is as to the place where the debtor may be found; and if

such uncertainty is caused by any act of his, it shall not avail him against the creditor. I say, then, that if I had concurred in any such construction of the limitation clause in the act of congress aforesaid, I should have required the jury to have been satisfied that the traverser was known to the government to have been the perpetrator of the crime with which he is charged; and that his stay, moreover, in this district, was so public, and of such duration, that the government either actually knew of it, or might be presumed, with reasonable diligence, to have known of it.

But I view this clause of limitation differently from my brothers. The exemption from liability or prosecution, after a lapse of two years, is a free and spontaneous and generous privilege, accorded to offenders by the bounty of the legislature; it is a mere act of grace, growing out of no meritorious or equitable claim on the part of the transgressor, but from the characteristic benignity of our laws; it can be forfeited but in one way, by fleeing from justice; if he flees, he forfeits the privilege; it is a penalty which, once incurred, cannot be relieved against; we have no equitable jurisdiction over it. It cannot be in the power of the offender, by any act of his, to restore himself to the situation he was in before fleeing. The language of the proviso is certain, positive, and absolute; exhibiting no doubt as to its interpretation; affording no ground for an equitable extension. I, therefore, do not agree with the majority of the court in giving this instruction to the jury.

As to the second instruction, that if the jury believe, from the evidence, that the traverser was not present at the burning of the treasury, aiding and assisting therein, but was at a distance therefrom, however guilty he may have been of procuring others to do the deed, that he is an accessory only, and they must acquit him on this indictment. I question much the propriety of giving this instruction; instructions not warranted by the law and the evidence are mischievous, as having a tendency to perplex the jury, and to divert their minds from the true objects of their consideration. This instruction would be a very proper one, if the facts proved by the evidence afforded any just grounds for granting it. Unless the evidence furnishes matter to warrant the instruction, it is irrelevant to the inquiry; a mere abstract proposition, having no connection with the facts in the case. Now there is not a particle of evidence, either of living witnesses, or of circumstances, which involves any other human being in the transaction, than the traverser and his brother; no evidence of the slightest character which furnishes a suspicion even, that the agency of any other than the traverser and his brother was concerned in it; and if they did it not, nobody did it, for de non apparentibus et non existentibus eadem ratio est; the traverser's

counsel might as well have prayed an instruction that if the jury believed, from the evidence, that the treasury building was fired by lightning, that they must acquit the traverser; would the court grant such an instruction in the absence of the slightest evidence of such a phenomenon? Every instruction of a court to a jury must be warranted by, and presupposes some evidence, for they always begin with an hypothesis, as, if the jury believe from the evidence, etc. Now if there be no just grounds for the hypothesis there is none for the instruction; for the instruction follows, and cannot take place but on the hypothesis; there must be evidence to justify the hypothetical form of the instruction. Of what avail is it to instruct the jury that they must find so and so, if there be not evidence on which the jury may find according to the instruction? Now whether there be any evidence at all of any supposed statement or case is for the court to say, and if there be none in their opinion they will not grant an instruction, which can only be granted on the fact of there having been such evidence. Now either the traverser and his brother both burnt the treasury together, both acting together as principals, or nobody burnt it; not a glance of suspicion falls from the evidence on any other; no other human being has been talked of, heard of, or to whom even suspicion could attach, but the Whites. If, however, it be contended that Henry alone burnt the treasury, and although instigated or incited by Richard to do the deed, Richard was not present, this would justify the instruction if there was the slightest evidence of the fact; but the evidence proves the contrary; for they both left Washington together in the same gig, and remained together during the whole night, and continued together until ten o'clock the next day, when they reached Baltimore; therefore Henry could not have burnt the treasury alone; all this is proved by the traverser's own and only witness to these facts; therefore as no other person is charged to have done the deed, or had a share in it, as there is not an atom of evidence inculpating any other, or creating a suspicion of the agency of any other, from which any inference could be drawn by the jury implicating any other; as there is no proof that the Whites were separated after they got into the gig at Washington, before the building was burnt, and until they arrived at Baltimore after the building was burnt, Henry alone could not have done it; but if they burnt the building Richard must have been present acting and participating in it, or they neither of them were concerned in it.

The traverser, then, must have been a principal, or he is innocent of the crime. There is no evidence whatever that he could have stood in the relation of an accessory. It ought to be proved against him. The whole evidence in the case negatives the possibility of his having been an accessory. I have too often seen these kind of lures thrown out like

a tub to the whale, to draw the jury's attention from the main object of their inquiry, and have regretted that such a practice has so frequently obtained indulgence; but the utter despair of being able to correct the evil, and the heat and contest likely to ensue from such an effort on my part, has deterred me frequently from interference, though often prompted to interpose. I should, for these reasons, refuse this instruction also; for if the traverser is permitted to escape conviction by irrelevant instructions and needless perplexing law points, calculated to embarrass a jury not being skilled in the science, nor possessing that professional tact and discrimination which can alone be acquired by long study and familiarity with the principles and nice technicalities of the law, where every word has weight, and often a peculiar technical sense, I should deservedly incur the penalty of the sentence which runs in these words, "Dum reus absolvitur, judex damnatur."[2]

MORSELL, Circuit Judge, thought there was evidence enough to justify the prayer of the defendant's counsel for the instruction as to the question of principal or accessory.

CRANCH, Chief Judge, said, that the absence of evidence that the defendant was present at the burning, was sufficient to justify the prayer.

The jury retired to consider of their verdict a little after 12 o'clock, on Thursday, the 12th of January, and having been out all night, came into court on the morning of the 13th, and said they found the defendant guilty of burning the treasury building, but acquitted him on the plea of limitations. This not being a formal verdict, it was agreed that the district attorney, and the counsel for the defendant, should each submit to the jury such form of a verdict as he supposed would be conformable to the intention of the jury, and that they should retire and bring in their verdict in that form which they found correct. After retiring, the jury returned and delivered the verdict in the form prepared by the defendant's counsel, as follows: "We of the jury are of opinion that the offence as charged was committed by the prisoner; and find him not guilty upon the plea of limitations, more than two years having elapsed, from the committing of the offence to the finding of the indictment."

This verdict was recorded; and on 18th of January, 1837, J. R. Key, for the United States, moved for a venire de novo, and the defendant's counsel moved for judgment in favor of the defendant, upon the verdict.

In support of the motion for a venire de novo, J. R. Key contended that the verdict was argumentative, and imperfect, in not finding the matter in issue, which, if the limitation of time had been specially pleaded, and the pleadings made up at full length,

would have been, either whether the defendant fled from justice, or whether, after fleeing, he returned, etc., so that he might have been arrested. Upon this point he cited the opinion of this court in Watkins' Case, July 29, 1829 [Case No. 16,649]; Co. Litt. 227a; U. S. v. Patterson, 2 Wheat. [15 U. S.] 221, 225.

MORSELL, Circuit Judge, suggested a query whether the finding of the defendant not guilty upon the plea of limitations, if it stood alone, would not be a sufficient finding of the issue joined upon the plea of limitations; and if so, whether the words "more than two years having elapsed," &c. might not be considered and rejected as surplusage.

THRUSTON, Circuit Judge, thought that if an issue had been joined upon the plea of limitations, it would have been upon the fleeing from justice; or upon the return of the defendant within two years.

J. R. Key. If the issue before the jury had been whether he fled, or returned, etc., some of the jurors may have been of one opinion, and some of another, upon those points, but all may have agreed that the two years had expired, &c., for that fact was not disputed. It is like the case upon the issue of solvit ad diem, cited in 8 Wheel. 312, from 6 N. H. 104. Mr. Key also cited Rowe v. Huntington, Vaughan, 75, 76; 5 Burrows, 2662; Evans' Harris, Entries, 335; Coffin v. Jones, 11 Pick. 45; Triplett v. Micou, 1 Rand. (Va.) 269.

R. J. Brent, for defendant, contra. This is not an argumentative verdict, the words "more than two years having elapsed," &c., may be rejected as surplusage. The jury have found that more than two years had elapsed, etc., which is a bar; and the pleadings do not show that the fleeing from justice was in issue; nor that the United States would have so replied. It was incumbent upon the United States to show that the offence was committed within two years next before the finding of the indictment. Ld. Raym. 1521. The jury are not bound to find a negative in any case. 1 Wils. 57. By finding for the defendant on the plea of limitations, they have in effect found that he did not flee from justice, or that there was no evidence of it. In pleading a statute, it is not necessary to show that the defendant is not within the proviso. The verdict, therefore, is not imperfect. Every thing not found in favor of the plaintiff is negatived. 2 Ld. Raym. 1585; 1 Wils. 55, 56; 1 Term R. 141; Worford v. Isbel, 1 Bibb, 250; 2 Burrows, 698; Hob. 54. Verdicts are to be favored. 3 Term R. 659; Garland v. Bugg, 1 Hen. & M. 377. The jury could not have found the defendant not guilty on the plea of limitations, if the United States had proved the fleeing from justice. Surplusage does not vitiate. Com. Dig. 252, "Pleader," § 28; 2 Com. Dig. 258, § 41; Thompson v. Button, 14 Johns. 86. Even if the clause of

---

[2] See note B at end of case.

limitation had been specially pleaded, and the pleadings had run on to the issue whether the defendant openly returned after fleeing from justice, and the verdict had been that they find for the defendant upon the plea of limitations, it would, in effect, have been a finding of the issue for the defendant.

The defendant's counsel offered to read the affidavits of some of the jurors as to their intention in finding the verdict, but THE COURT (nem. con.) refused to hear them. See Woodfall's Case, 5 Burrows, 2665.

F. S. Key, in reply. The issue upon the plea of limitation would have been, whether the defendant fled or returned, etc. The verdict does not find the fact one way or the other, but has found a fact not in issue. It is therefore imperfect; and it gives a reason for that finding; it is therefore argumentative and void. The United States were not bound to aver, in the indictment, that the offence was committed within the two years; but the defendant must plead, or allege it affirmatively, namely, that more than two years had elapsed. etc. Com. Dig. "Pleader," § 22; Hob. 54, note 2, to the American edition.

THE COURT (CRANCH, Chief Judge, contra), awarded a venire de novo.

MORSELL, Circuit Judge, was of opinion that the verdict was argumentative, and therefore bad.

CRANCH, Chief Judge, delivered the following opinion:

This is an indictment against Richard H. White, for burning the treasury building on the 30th of March, 1833. The indictment was not found until the 30th of March, 1836. In a criminal case the defendant is permitted to avail himself of the limitation of the statute of April 30, 1790, upon the general issue, and the United States may rebut it by evidence that the defendant was a person fleeing from justice; and if the United States can show that any time during the two years he fled, the defendant (according to the opinion of the court given upon the trial) may rebut this by evidence that he appeared publicly and notoriously, so that by reasonable diligence he might have been arrested. Such was the course in the present case, and the jury found the following verdict: "We, the jury, are of opinion, that the offence as charged was committed by the prisoner, but find him not guilty upon the plea of limitations; more than two years having elapsed from the committing of the offence to the finding of the indictment." Upon this verdict the defendant has moved for judgment in his favor; and the attorney for the United States, has moved for a venire de novo, upon the ground that the verdict is imperfect.

In criminal cases, the pleadings subsequent to the indictment are generally considered as ore tenus. If they had, in this case, been reduced to writing, so far as they relate to the limitation of time, the defendant would have pleaded in substance that the indictment was not found within two years from the time of committing the supposed offence; to this the United States would have replied that the defendant was a person "fleeing from justice;" to this replication the defendant might have put in a general rejoinder, upon which an issue might have been joined; or he might have replied (according to the opinion of the court given on the trial) that, after so fleeing, he returned, and appeared openly, publicly, and notoriously in this district, or elsewhere in the United States, so that with reasonable diligence he might have been arrested; to which the United States would have put in a general surrejoinder, upon which the issue might have been joined, so that the plea of limitations would have resulted in an issue upon the fact of flight, or the fact of return, etc. There would then have been two issues for the jury to try: (1) The general issue of not guilty; and (2) the issue raised upon the plea of limitations. If the jury had found either issue for the defendant, it would have been sufficient for judgment in his favor. If the jury had said that upon the first issue they find the defendant guilty, and upon the second they find for the defendant, their verdict would, in such a state of the pleadings, have been good. I think this case must be considered as if such had been the pleadings upon the record, and such the verdict. A verdict is not subject to the nice criticisms which may be applied to special pleadings. If the issues are substantially, though informally found, the court may work it into form. Hawks v. Crofton, 2 Burrows, 699.

As to the first issue the jury say, they "are of opinion that the offence, as charged, was committed by the prisoner." This seems to be a clear finding the defendant guilty upon the general issue. As to the second issue, they "find him not guilty upon the plea of limitations." This, I think, is substantially a finding of the issue upon the plea of limitations, for the defendant. It is perhaps informal to say that they find the defendant not guilty on the plea of limitations, but I have no doubt that their meaning was that they found the issue, upon that plea, for the defendant. And the issue upon that plea, according to the conduct and argument of the parties before the jury, and the instructions given by the court, was either, whether the defendant was a person fleeing from justice, or whether, after fleeing, he returned openly, etc., so that with reasonable diligence he might have been arrested. This, certainly, is not a special verdict purporting to state all the facts proved to the satisfaction of the jury, and referring the matter of law to the court: nor is it a partial verdict, finding the defendant guilty of part, and acquitting him of the residue of the charge; nor do I think it an imperfect verdict, for it answers substantially to the

whole issue, or issues in the case. And I think that the latter words, "more than two years having elapsed," etc., may be rejected as surplusage. They only state a fact admitted by the pleadings if made up in form, and do not purport to be the only fact upon which their finding is founded. They create no repugnancy in the verdict; and "if the jury find the point in issue, and also another matter out of the issue, the latter finding," says Mr. Justice Story in the case of Stearns v. Barrett [Case No. 13,337], "is void and may be rejected as surplusage." The fact, that two years had elapsed, was a matter out of the issue, for it was admitted in the pleading. So if they find a matter within the issue, if it be not contradictory, it may be rejected as surplusage. Sufficient is found to enable the court to collect the point in issue out of the verdict; and if so, the same learned judge, in the same case, says, "it will be sufficient." I think the verdict is "expressed substantially in the terms of the issue," and is therefore sufficient ground of a final judgment for the defendant.

THE COURT, however, is of a different opinion, and a venire de novo is awarded.

[See Cases Nos. 16,677–16,679; also, 16,676.]

NOTE A. It was also said that the verdict is argumentative, and Com. Dig. "Pleader," § 22, was cited. "So in all cases, a general verdict which finds the point in issue by way of argument, is void, though the argument or inference is necessary." Vaughan, 75. This is a dictum of Vaughan, in arguing the case of Rowe v. Huntington, upon a special verdict, and is an inference which he draws from a case which he cites from 2 Rolle, Abr. 693. Barry v. Phillips, N. 30 (meaning Baugh v. Phillips, 30). The case in Rolle is this, "In an action of debt for £20, if the defendant plead quod solvit le £20, and the issue is an solvit ceo ou nemy, and the verdict is quod debet le £20, this is not good, because it is only by argument. M. 13 Jac. B. R. inter Baugh and Phillips, adjudged on writ of error." Same case, 1 Rolle, 257. Here the issue was not directly found, and the fact in issue (namely, whether the defendant had paid the £20) could only be inferred by the finding that the defendant owes it. But if the jury had expressly found that the defendant had not paid the £20, and added, "he still owing it to the plaintiff," the matter in issue would not have been found by inference only, but directly. The fact that he had not paid it, would be no more an inference only, but directly. The fact that he had not paid it, would be no more an inference from the fact that he owed it, than the fact that he owed it would be an inference from the fact that he had not paid it. The doctrine of Vaughan cannot be extended beyond the case from which it was drawn. It does not apply to a case where the matter in issue is expressly and positively found, although the jury find something more which was not in issue. In the present case, the jury have, in effect, found the issue upon the plea of limitations, for the defendant, and there is no necessity of resorting to inference to support it, as there was in the case cited by Vaughan. I, therefore, do not think it an argumentative verdict, within the meaning of that case. See, also, Com. Dig. "Pleader," 18, 26, 28; Hob. 54.

NOTE B. On a subsequent day, Judge Thruston read in court the following paper:
In the following remarks I am furnished with an occasion of noticing certain charges which have been exhibited against me of arguing to the jury on matters of fact, charges founded either in malice or want of a due understanding of the true lines of demarcation between matters of law and matters of fact. This instruction affords, I say, a fair occasion to give my views of the distinction between matters of law and matters of fact, because it is one of my main objections to the instruction that it involves both matters of law and matters of fact. I take matters of fact to be, in a legal sense, such as by competent testimony, either written, oral, or circumstantial, go to prove the allegations or averments, in any plea, on which an issue is made to be tried by a jury. I take matters of law to be the judgment of the law upon those facts, if proved to the satisfaction of the jury. If a court give an instruction to a jury, or charge a jury, such instruction or charge must necessarily be hypothetical, because the court cannot assert any fact to be true, or proved by the evidence, but must leave such truth or proof to be judged of exclusively by the jury; but they may inform the jury what the rule or principle of law is, if they shall be satisfied of the truth of the facts attempted to be proved; therefore, an instruction by a court to a jury is always in this hypothetical form: "If the jury believe from the evidence so or so, then the law is so or so," and so must be a charge by the court to the jury.

Of all nice questions, and among those the least understood, is that of what is matter of law and what is matter of fact. I cannot, perhaps, illustrate this question better, than by taking for example the instruction given by the court to the jury in Richard White's case, transcribed below, on which I think it will be made apparent, to any intelligent mind, possessing the faculty of rational discrimination, that in that memorable instruction the court did so confound law and fact, that in the hypothetical part of the instruction matter of law is stated as matter of fact, and that on the legal inference or rule of law, as laid down by the court, drawn from the supposed matter of fact, they have based the rule upon both matters of law and matters of fact. As no objection was made to the instruction on this ground, it seems clear, that the attorney for the United States did not discern this valid objection to the instruction, or was deceived by the want of clear perceptions of the distinction between matter of law and matter of fact. The instruction was in these words, namely: "If the jury believe from the evidence that the departure from this district by the traverser, on the evening of the 30th of March, 1833, or at any time afterwards within two years, was, for the purpose or with a view to avoid punishment for the offence of burning the treasury building, or for any other offence, this was a fleeing from justice, and the statute of limitations is no bar; unless the jury should also believe that the said prisoner afterwards returned to the county of Washington, and that his return was so open and public, and under such circumstances, that opportunity was afforded by the use of ordinary diligence and due means to have arrested him; and that two years and more have elapsed from that period to the time of finding the indictment in this case." Now the court heard all the evidence which the jury did, relating to the traverser's return, and of its openness and publicity, and all the circumstances attending such return, and what was that evidence? as follows:

The traverser came to this city on Sunday evening in the stage, as he said, from Baltimore, and lodged at Mrs. Howard's, a boarding-house in rather a retired part of the city, where he breakfasted the next morning, and after breakfast walked, in company with Mr. Howard, to the capitol, congress being then in session, and went into the congress library there, and left this city before dinner the same day, to go (as he said) to Leesburg, in Virginia. This was all the evidence of the openness and pub-

licity of the traverser's return and the circumstances attending it, except that the circumstances, as proved by the prosecutor's witnesses, very much impaired the force of the circumstances, as bearing in favor of the traverser; because competent evidence was offered to the jury that the traverser was, at the time of such return, travelling under a feigned name; and moreover the testimony of another witness, Mr. Eaton. rendered it questionable whether the traverser did actually return. as stated by Howard and wife, at the time alleged by them: but that some other person, by the name of White, and not the traverser, was the person supposed to be the traverser by said Howard and wife.

I have thus stated all the evidence as to the traverser's return, and the circumstances attending it. upon which, and which alone, the court ought to have instructed the jury as to the inferences of law upon those facts; but what did they do? They left the jury to draw inferences of law themselves, from those facts; and then, upon the jury's first being satisfied with the truth of those facts, and drawing such inferences of law from those facts as the instruction declares, they were then to be governed by the court's inferences of law, from the jury's inferences of law, drawn from the facts. When the court inform the jury that the statute of limitations is a bar, if the jury believe from the evidence that the traverser's return and the circumstances attending it were "*so open and public, and under such circumstances, that opportunity was afforded by the use of ordinary diligence and due means, to have arrested him,*" let me ask if these underscored words are any part of the evidence, or facts in the case; or are they not rather matters of law arising out of the facts? The facts are stated in full above, all which the court heard, and every circumstance connected with the traverser's return, as fully as the jury. Is it not upon those facts only that the instruction of the court should have been given, and not upon the jury's opinion of the legal inferences from those facts? Why should the court, possessed as they were of every word of the evidence. leave it to the jury to say what constituted openness and publicity? Surely they were as competent to judge of this as the jury? Is it the exclusive province of the jury to say how much exposure of one's person, in this or that place, and for what length of time, amounts, in the eye of the law, to openness and publicity? But this is not all; the jury are empowered also to determine other more clear questions of law, as inferences from the facts of which evidence was offered by the witnesses; they are to say that the traverser's return, etc., was not only open and public. but under such circumstances that opportunity was afforded, by the use of ordinary diligence and due means, to have arrested him. Arrested! by whom? Opportunity also was to be inferred from the facts stated in evidence; of this opportunity the jury were to be the exclusive judges. Now, opportunity means "suitableness of circumstances to any end;" then opportunity, in the instruction, means that the traverser was in circumstances suitable to be arrested. for that was the end contemplated in the instruction. of which the jury were to be satisfied, and of which they were to be the judges. But this opportunity to be arrested. or being in circumstances suitable to be arrested, comprises things of which there was not a particle of evidence; there was no evidence that the government, or any of its officers, or any other person whatever, had the least knowledge that the traverser was the incendiary of the treasury building, or, if possessed of this knowledge, that he was at that time within the county of Washington. How was it possible, then. that the short stay of the traverser in the county of Washington afforded an opportunity or circumstances suitable to the end of arresting him? Here. then, it was left to the jury to say that there was such an

opportunity, when it is evident that it was a moral impossibility to have arrested him, and an utter lack of evidence to warrant an inference of such opportunity. Was it not, then, entirely a question of law whether the evidence could authorize such inference by the jury? Was it not agitated between the judges as a question of law, and did not Judge Thruston, although overruled by the court, state it as his opinion. that to authorize such an instruction at all, the jury must be satisfied that the traverser was known to have been the incendiary, and known to those legally authorized to have arrested him to have been in the county of Washington; or, under such strong suspicions to have been so, as to have justified his arrest? It is true. the other two judges did verbally tell the jury that such knowledge or suspicion was not necessary to have been proved; then it ought to have been made part of the instruction, before it should have been left to the jury to determine what circumstances afforded an opportunity to have arrested the traverser. Without appearing on the face of the instruction itself, it makes the instruction, or rather the important word "opportunity," a perfect solecism, a most inopportune word. An instruction should contain on the face of it every thing material to warrant its being granted; and should not be patched up with verbal supplements. If, then, opportunity to arrest an offender is a compound idea, involving a question of law, as it clearly did in this case, because involving, according to the opinion of one of the judges, a knowledge on the part of the government that the traverser was the offender; and this law question was settled by the court overruling, by a majority, the judgment of one of the judges, what was this but leaving an inference of law to be drawn by the jury from the facts in the case; and as to the point contested by the judges, without any evidence whatever? Again, if there be doubt on this point. there seems to be none that the other parts of the instruction are questions of law. The jury are left to determine that opportunity was afforded, by the use of ordinary diligence and due means, to have arrested the traverser. Here the jury are to determine what ordinary diligence is; that is to say, that the government were or were not guilty of laches; for ordinary diligence is the opposite of crassa negligentia, or gross laches. Is laches a question of fact, or an inference of law from facts to be judged of by the court and not the jury? When the court hear all the facts, is it not their province to say whether they impute, in the eye of the law, laches or not? and, if asked to instruct the jury whether the facts proved by the evidence imply laches or not, shall a court adjudge that it is the province of the jury, and not theirs, to determine this point? Again, the jury are left to judge of the use of due means. Is this a question of law or fact? Clearly the first, it seems to me; "due means" imply "lawful means." Now what are lawful means, is a question involving constitutional law, as well as common law. The fifth article of the amendments to the constitution of the United States declares. "that no person shall be deprived of life, liberty, or property, without due process of law:" and the fourth article says, "No warrant shall issue to seize the person but upon probable cause, supported by oath or affirmation. describing the person to be seized." Now, although the court had judicial notice that the government were utterly ignorant of the traverser's having been the incendiary of the treasury building; or. at least, that there was an absence of the least evidence that any knowledge of his having been such incendiary could have been imputed to them, or to any other person, or that he was in the county of Washington: and that it was impossible, pursuant to the said fourth article of the constitution, to describe the person, so as to have authorized a constitutional warrant to have been issued to arrest him, or to have enabled the government to have used "due means" to arrest

him, yet they leave it to the jury to determine and adjudge that these "due means" were in the power of the government. . But to say nothing of this ignorance of the traverser's having been the incendiary, on the part of the government, and that he was in the county of Washington, are not "ordinary diligence" and "due means" pure questions of law growing out of the facts as proved by the evidence, to be determined by the court and not the jury? What is "ordinary diligence?" Does it mean "reasonable diligence?" Then if the jury find that the government was afforded an opportunity, by "ordinary diligence," to have arrested the traverser, and did not do so, they were guilty of "laches," and so they, and not the court. are to adjudge what degree of negligence amounts, in a legal sense, to "laches." Again, "due means" involve matters of fundamental as well as common law, as I have shown, from the fourth and fifth articles of the constitution. Did the jury know that "due means," otherwise "lawful means," required an oath to be made by a competent witness, charging the traverser as the incendiary? that a warrant must be awarded and issued by a magistrate? that this warrant must be put into the hands of, and executed by, a sworn officer? Are not all these points of sheer law? Did the jury know, or were they informed, that "due means" comprised all these processes? or did the evidence which I have stated fully above, admitting the jury to have been competent to judge of these nice points of law, authorize the court to leave it to the jury to infer any such "due means?" Thus the court, on the aforesaid instruction, first left it to the jury to say whether or not they believed that the traverser did return to the county of Washington, in the manner and under the circumstances as stated by the traverser's witnesses. This was certainly very proper. Although there was contradictory and pretty strong evidence on the side of the prosecutor, it was proper for the jury to weigh the evidence, and to judge according to their impressions of it. These are mere facts; but the court leave it to the jury to say whether or not it was so open and public as, etc. This part of the instruction is at best questionable; it is questionable, as the court heard all the evidence, whether they, and not the jury, should not have adjudged it to have been so "open" and "public" as to have warranted the residue of the instruction. Then they leave it to the jury to say that it was sufficiently "open" and "public" to have afforded an "opportunity," by "ordinary diligence" and "due means," to have arrested the traverser. I have endeavored to show that the court erred in this part of the instruction; for if the jury were permitted to say whether the government had used "ordinary diligence" or not, it was leaving to them to draw an inference of "laches" on the part of the government, which seems to me to be a question of law. They were also permitted to infer, that the government did not use due means to arrest the traverser; and I have endeavored to show that "due means," which are the same as "legal means," involve questions of fundamental, as well as common law. I will now present this question in other aspects. Suppose Howard, the only witness to White's public exposure of himself, for he was the only witness who testified that White was in the streets of Washington, or in the capitol and library there; I say, suppose Howard had been asked this question. do you think White's exposure of his person in Washington, when he walked from your boarding-house to the capitol, etc., was so open and public, and under such circumstances, that opportunity was afforded, by ordinary diligence and due means, to have arrested him? would he not, if a man of reasonable understanding, say that he could not answer that question? He would very properly object that ordinary diligence was a matter of law; that he could not say how much was to be done before the government could be prepared to arrest him; that due means was still more

perplexing to him, for he was not lawyer enough to know what due means, or legal means were; but the court would not have permitted such a question to be put to the witness, as involving mere matters of opinion on points of law.

Let us now take a view of this instruction in another aspect. Let us suppose the evidence of Howard and wife to have been given, stating all the circumstances of the traverser's return to this district as it was given to the jury by the said witnesses, and the attorney for the United States had demurred to the evidence, it would in that case have been the exclusive province of the court to have judged of the sufficiency of such evidence, as affording an available defence for the traverser. Would the court have ventured to pronounce that such return, under the circumstances, as proved by Howard and wife, was so open and public, and under such circumstances, that opportunity was afforded, by the use of ordinary diligence and due means, to have arrested him? If the court would not and could not have drawn such inferences, then it should not have been left to the jury to have drawn them. I say the court could not, or at any rate ought not to have drawn such inferences. Let it be observed, that the act of congress "for punishing certain crimes against the United States," has given to offenders the benefit of the two years' limitation, upon the sole condition of not fleeing from justice; that if the condition be broken the offender has forfeited this benign indulgence; that the court, notwithstanding, have extended this privilege beyond the letter, and adjudged that, although the offender, having forfeited the privilege, may be restored to it by returning to the district, and exposing his person to arrest. This is clearly, if any thing, an equitable extension of the terms on which the offender may claim the benefit of the limitation. There is no such provision in the law. If the court will thus stretch the law to embrace what they suppose to be an equitable construction of it, should they not at least pay some regard to fairness and equal justice? and not cause such equitable construction (if it can be so called) to bear altogether on one side? Now, although it may be admitted, that if two years elapse from the commission of the offence to the finding of the indictment, that the offender is absolved, by the clause of limitation, from liability to punishment, although the government remained in perfect ignorance of his having been the offender, yet very different ought the construction to be when the court undertake to add new terms to the law, and adjudge that if the offender having once fled, and thus forfeited the benefit of the two years' limitation, that he may be restored to it by returning to the district, and remaining therein half a day, the government being entirely ignorant that he was the incendiary, or that he was there. What kind of equity is this? It was morally impossible that the government could have arrested him, even had his stay here been ever so long or ever so public, unless such knowledge can be forced upon them. Let it be understood, that by the government I mean those executive officers representing the government, whose especial duty it is to arrest and bring to punishment violators of the law. If, with such knowledge that the traverser was the offender, and that he was here, in reach of legal process, the government neglected for two years to have here arrested him; then indeed laches might reasonably be imputed to them, and there would have been something like reciprocity and fairness in such construction of the statute.

I have been utterly in the dark, as to the grounds upon which the aforesaid instruction was given to the jury, inasmuch as the court have assigned no reasons for having given it. It cannot be from any analogy drawn from the statutes of limitation in civil cases, because it is an express provision of the statute, that if the debtor returns to the county after abscond-

ing, that the creditor must sue him within the time mentioned in the law after such return, or the debtor shall have the benefit of the limitation; if he do not so sue, there would be laches without excuse, because the debtor is not only in such case within reach of process, but is known to his creditor, and the law expressly declares that the time limited for bringing suit shall commence from the date of the debtor's return. But the government did not know that the traverser was the offender, and therefore it was morally impossible to have arrested him. Here the analogy fails. It fails also in this: the law of Maryland expressly gives the benefit of the limitation to the returning debtor, and dates the commencement of the running of the time from the period of the debtor's return. But the act of congress dates the commencement of the two years from the time of the commission of the offence: but the court have amended the statute, and declared that the time for the commencement of the running of the two years shall be that of the return of the offender to this district. Here also the analogy fails. Such new date of the beginning of the time of limitation was fixed in Maryland by express statutory provision; here it was fixed by a judicial supplement to the act of congress.

Again; admitting for argument's sake that the court were right in annexing this supplement to the act of congress, and in leaving also to the jury to draw the questionable inferences above descanted on from this supplementary extension of the act, yet is it not a rigorous and severe construction of this supplement, to subject the government to the penalties consequent upon laches, for having omitted one occasion only of arresting the offender, where the time of his stay in this county was so short, and his exposure of his person so limited, that it would have been an uncommon accident if he should have been seen by any of those executive officers of the government whose peculiar province it is to arrest offenders, and would have required uncommon industry to have obtained the due means of arresting him? Some one must be found to charge the offender on oath. It cannot be presumed, that he could have been known to everybody either to have been the offender or that he was in the county. Suppose he was known to the president and cabinet to have been the offender. Did any of them see him, or know that he was here? Suppose the marshal had this knowledge; did he see him, or know that he was here? Did any deputy marshal or constable see him, or know that he was here? Did any of these officers, admitting that Richard White was known to have been the incendiary, know his person? Now by the court's instruction the government had two years from the time of White's return as aforesaid to have arrested him; is it not a hard, and a rigorous, severe, and unequal interpretation of the court's own supplement to the law, to subject them to the forfeiture of their right to prosecute and punish the transgressor, because they did not seize one single and questionable chance of arresting him, only within the possibility of their having done so, within the whole two years?

Let us again take another view of this instruction. After having been given to the jury, they withdraw to their room: the foreman takes up the instruction and reads it to the jury: suppose, then, one of the jury rises, (and it is a matter of surprise to me that it did not so happen,) and says: "Mr. Foreman, if I understand this instruction, we are authorized to say, that if ordinary diligence, and due means were used, White might have been arrested. Now, Mr. Foreman, I do not know what due means are, I am not lawyer enough to know this. I therefore cannot say, unless I know what these due means are, that are to be used, whether White's stay here was long enough to have provided them. I therefore cannot judge whether by ordinary diligence, he could have been arrested or not." Now here is matter of sheer law,

that ought to have puzzled any jury, (and that they were not so puzzled is matter of surprise,) which the court permitted the jury to pass upon, not as facts to be found by them, as the basis of the court's inference of law, but as inferences of law to be drawn by themselves from the facts as detailed by the witnesses. Well, let us suppose the foreman, (and no improbable supposition,) no better lawyer than the juryman who applied to him for information of what due means were, in the contemplation of law? how could they get on? The next step would have been, to come into court to ask for explanation of those terms of fine legal import. Suppose them in court; the foreman says: "May it please your honors, we are at a stand. We do not know what due means signify according to law. It seems to us that the court have devolved upon us the duty of drawing inferences of law from facts, and we believe that our province is to find facts, and leave to the court to draw inferences of law. But if we are bound to draw these inferences, we beg your honors to tell us, what those due means, mentioned in the instruction, are: for we are not learned in the law, and believe that some ceremonies are necessary before an American citizen can be subject to be seized in his person, and we do not know what those ceremonies are." The court, to satisfy these inquiries of the jury, would say to them: "Gentlemen, it is very true, that what constitutes a legal or due arrest of a citizen, is matter of law, and often of nice law. The fourth and fifth articles of the amendments to the constitution of the United States, will teach you what is to be done, to justify the seizure of a citizen's person. There must have been an oath made, by some competent witness, that White was the incendiary, and was in this county: this oath to be made before a magistrate. He must then work out his warrant directed for the apprehension of White; then this warrant must be put into the hands of some sworn officer, to execute; and then he must find out White in order to arrest him: these are the due means, or legal means meant by the instruction. But the foreman would very naturally reply: "May it please your honors, we did not know all this law. Had the court stated specifically in the instruction what was necessary to be done under the terms. due means, we might, perhaps, have saved the court the trouble. We humbly conceive, all these processes of law should have been specially set forth in the instruction."

Again, as to this word opportunity. It was leaving to the jury to say that there was opportunity to have arrested White, when by the very terms of the verbal part of the instruction, it is manifest there was no opportunity for executing such purpose; for there was no evidence that the government, or those representing the government, and whose peculiar duty it is to arrest offenders, did know that White was the offender, or that he was even in this county at the time alluded to in the instruction; it was morally impossible, if even there was a physical possibility to have arrested him, to have done so, and yet the court leave it to the jury to say that there was such opportunity, and at the same time inform them, that it was not material to constitute this opportunity, that White should have been known to have been the offender. Now is not this knowledge indispensably necessary to create the opportunity? The word opportunity, therefore, was too broad and comprehensive a term to have been used in the instruction; the evidence did not justify it; to have presented this opportunity, knowledge of the offender was required. It is one of the natural elements or ingredients of opportunity, one of those suitable and indispensable to the end of arresting White; for without it, it was not possible to have attained that end. It was a contradiction in terms, to leave it to the jury to say there was such opportunity, and at the same time tell them that one of the essential elements or ingredients of this opportunity need

not be or exist; it therefore seems to me that what the court should have said was, that if White's appearance in this county, was in their estimation sufficiently open and public, that then they might judge and say if they so thought, that there was time enough and not opportunity afforded thereby, by the duration of his stay in this county, to have arrested him; but to leave it to the jury, by the written part of the instruction, to say that there was this opportunity, when by the verbal part of the instruction, informing them that knowledge of White's being the incendiary was not necessary, for want of which it was morally impossible to have arrested him, was leaving to the jury to find that a thing impossible to be done, might nevertheless be done. In fact, taking the whole of the instruction together, the verbal part, and the written part, the whole was rendered a felo de se. The word opportunity, then, should not have been in the instruction; but it seems to me that to have made it conformable with the true meaning of the court, it should have run thus: "Unless the jury should also believe that the traverser afterwards returned to this county, and his return was so open and public, and under such circumstances that (had the government known that he was the incendiary) they ought to have known that he was in this county, and that his stay here was long enough, by the use of ordinary diligence and due means, to have arrested him." This form of instruction would have left to the jury to find precisely what the court meant to have left to them; namely, that the traverser was here so openly and publicly, and under such circumstances, that the government might, by ordinary diligence and due means, have discovered that he was here, and had time enough, with such knowledge, to have arrested him. This was certainly all that the court did mean to leave to the jury; but to leave to the jury to say that there was opportunity to have arrested him, was leaving them to find, that which the very terms of the instruction, taking the verbal and written parts together, was what was impossible to have been found.